WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Travelers Indemnity Company, as subrogee of Tourism and Sports Authority d/b/a Arizona Sports & Tourism Authority,<br><br>  Plaintiff,<br><br>vs.<br><br>Crown Corr, Inc.,<br><br>  Defendant. | No. CV 11-0965-PHX-JAT<br><br>**ORDER** |

Pending before the Court are: Plaintiff's Motion for Extension of Time to File Answer (Doc. 28), Motion for Summary Disposition of Motion to Dismiss Third Amended Complaint with Supporting Affidavit (Doc. 27), Defendant's Motion to Strike Affidavit Attached to Third Amended Complaint with Supporting Affidavit (Doc. 23), and Motion to Dismiss Third Amended Complaint with Supporting Affidavit (Doc. 22). The Court now rules on these Motions.

**I. PLAINTIFF'S MOTION FOR EXTENSION OF TIME AND DEFENDANT'S MOTION FOR SUMMARY DISPOSITION**

On September 8, 2011, Defendant filed a Motion for Summary Disposition of its Motion to Dismiss based on Plaintiff's failure to timely respond to Defendant's Motion to Dismiss. It is undisputed that Plaintiff's response to Defendant's Motion to Dismiss was due on or before August 29, 2011 and Plaintiff did not file its response until September 13, 2011.

In response to Defendant's Motion for Summary Disposition, on September 12, 2011, Plaintiff filed a Motion for Extension of Time to respond to Defendant's Motion to Dismiss. Plaintiff argues that summary disposition of the Motion to Dismiss would be inappropriate because Plaintiff's counsel misread the rule for responding to a motion to dismiss and mis-calendared the deadline to respond.

### A. Summary Disposition

Local Rule of Civil Procedure 7.2(i) provides that if "counsel does not serve and file the required answering memoranda . . . such non-compliance may be deemed a consent to the . . . granting of the motion and the Court may dispose of the issue summarily." LRCiv. 7.2(i). Local Rule 7.2(c) requires responsive memoranda to be filed within fourteen days after a motion is served.

"Failure to follow a district court's local rules is a proper ground for dismissal." *Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir. 1995) (citing *U.S. v. Warren*, 601 F.2d 471, 474 (9th Cir. 1979)). However, "[b]efore dismissing the action, the district court is required to weigh several factors: '(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the [party seeking dismissal]; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.'" *Id.* at 53 (quoting *Henderson v. Duncan*, 779 F.2d 1421, 1423 (9th Cir. 1986)).

While the first two factors often favor the imposition of sanctions, the Court finds that Plaintiff's fifteen day delay in this case has not significantly affected the public's interest in expeditious resolution of litigation or the Court's need to manage its own docket. Further, the element of prejudice is essential and "delay alone, without focus on its effects, will not justify dismissal." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). Defendant argues that it "has been prejudiced by being required to incur the cost of representation in this case." (Doc. 27 at 3). Defendant's employment of counsel has little to do with Plaintiff's fifteen day delay in filing its motion and, if this were enough to equal prejudice, prejudice would be present in nearly every case. Accordingly, Defendant has failed to demonstrate that

it has suffered prejudice due to Plaintiff's fifteen day delay. Further, the public policy favoring disposition of cases on their merits weighs in Plaintiff's favor. Finally, less drastic sanctions are available to Defendant. Accordingly, the Court finds that, on balance, the factors weigh in Plaintiff's favor and Defendant's Motion for Summary Disposition is denied.

### B. Plaintiff's Motion for Extension of Time

Pursuant to Federal Rules of Civil Procedure 6(b)(1)(B), Plaintiff moves for an extension of time to answer Defendant's Motion to Dismiss. Rule 6(b)(1)(B) provides that "the court may, for good cause, extend the time on motion made after the time has expired if the party failed to act because of excusable neglect." Plaintiff claims that its delay in filing its Response was due to excusable neglect because Plaintiff's counsel mistakenly thought that Local Rule of Civil Procedure 12.1 applied to its Response to its Motion to Dismiss. Rule 12.1(b) provides "the time schedule for response, reply, and oral argument for motions to dismiss *for lack of jurisdiction* shall be the same as for motions for summary judgment, as set forth in Rule 56.1, Local Rules of Civil Procedure." (emphasis added). Plaintiff's counsel avers that, under this Rule, he mistakenly believed Plaintiff had thirty days to respond to Defendant's Motion to Dismiss, and not the fourteen days actually provided by Local Rule of Civil Procedure 7.2(c).

The determination of whether neglect is excusable is an equitable one that depends on at least four factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223-1224 (9th Cir. 2000).[1] Although the Ninth Circuit Court of Appeals has recognized "that a lawyer's failure to read an applicable rule is one of the least compelling excuses that

---

[1] Although Defendant argues that this test is inapplicable to motions under Federal Rules of Civil Procedure 6(b)(1)(B), the Ninth Circuit Court of Appeals has made it clear that this test is to be applied in all motions under the Federal Rules of Civil Procedure claiming "excusable neglect." *See Pincay v. Andrews*, 389 F.3d 853, 855 (9th Cir. 2004).

can be offered," it instructs that the right way to decide "cases involving ignorance of federal rules is with an 'elastic concept' equitable in nature, not with a per se rule." *Pincay*, 389 F.3d at 859 (internal quotation omitted).

Accordingly, the best way to decide if excusable neglect exists in this case is an equitable balancing of the four factors. As discussed above, the Court finds that Defendant has not been significantly prejudiced by the fifteen day filing delay at issue here. Further, there has been no delay in the proceedings, and there is no evidence of bad faith. Although Plaintiff's counsel's failure to adequately read the rules is "one of the least compelling excuses that can be offered," the overall balancing of the factors weighs in Plaintiff's favor. Accordingly, Plaintiff's Motion for Extension of Time is granted.

## II. THE COMPLAINT

In its Complaint, Plaintiff alleges three causes of action: breach of contract, contractual indemnity, and negligence. All three causes of action arise from the same set of facts.

### A. Factual Background

Plaintiff Travelers Indemnity Company (hereinafter "Plaintiff" or "Travelers" or the "insurer") is a Connecticut corporation and brings its claims as subrogee of Tourism and Sports Authority (herein after the "insured" or "Tourism and Sports Authority"). Defendant Crown Corr, Inc. is an Indiana Corporation.

Tourism and Sports Authority is the owner of the University of Phoenix Stadium (the "Stadium"). Tourism and Sports Authority entered into a contract with the Arizona Cardinals and Hunt Construction for the design and construction of the Stadium (the "Design/Build Agreement"). Hunt Construction then entered into a subcontract with Defendant Crown Corr (the "Subcontract"), wherein Defendant agreed to design the Stadium's exterior enclosure system.

The Stadium opened on August 1, 2006. On July 29, 2010, a rainstorm caused thirty-eight metal panels to fall off the stadium. Plaintiff alleges that, during their fall, the metal panels caused significant damage to the stadium's facade, the retractable roofs, and the sound

system and speaker clusters. Plaintiff alleges that the failure of the panels and the subsequent damage caused by that failure were a direct result of Defendant's negligence. Plaintiff alleges that Defendant agreed and promised that those panels would be able to withstand wind speeds in excess of those that occurred during the July 29 storm.

On the date of the storm, Tourism and Sports Authority, as the owner of the Stadium, was insured by Plaintiff Travelers Indemnity Company. Plaintiff alleges that it incurred over $1,400,000 in damages as a result of the storm damage. Plaintiff alleges that Tourism and Sports Authority is a third-party beneficiary of both the Design/Build Agreement and the Subcontract (collectively, the "Contracts"). Plaintiff further alleges that the Subcontract provided that Defendant would indemnify Tourism and Sports Authority for all claims arising out of Defendant's work on the Stadium. Plaintiff alleges that, as subrogee of Tourism and Sports Authority, it is entitled to enforce all of Tourism and Sports Authority's rights under both contracts.

### III. THE MOTION TO DISMISS

Defendant moves, pursuant to Federal Rules of Civil Procedure 12(b)(6), for dismissal of Plaintiff's Third Amended Complaint with Supporting Affidavit (the "Complaint") for failure to state a claim upon which relief can be granted. Defendant claims that Plaintiff has failed to state a claim upon which relief can be granted because "it seeks recovery as its insured's subrogee under contracts that expressly, clearly, and unambiguously release and waive Plaintiff's claims." (Doc. 22 at 2).

**A. Breach of Contract and Breach of Contractual Indemnity (Counts One and Two of the Complaint)**

The main dispute between the Parties concerns the contract language contained in Article 11 of the Design/Build Agreement,[2] entitled "Indemnity, Insurance and Waiver of Subrogation" and Section 8 of the Subcontract, entitled "Insurance Requirements."

---

[2] As noted above, the Parties to the Design/Build Agreement are B&B Holdings, Inc. d/b/a Arizona Cardinals, The Tourism and Sports Authority, and Hunt Construction Group, Inc.

- 5 -

Defendant argues that the waivers contained in Article 11 and Section 8 clearly show that all Parties to both contracts intended to waive the subrogation rights of any and all insurance companies that paid claims for property damage to the Stadium.

Section 11.4.6 of the Design/Build Agreement provides,

> The Parties[3] waive subrogation against one another, the Design/Builder, Design Consultants, Subcontractors, and their respective agents and employees on all property and consequential loss policies that may be carried by any of them on adjacent properties and under property and consequential loss policies purchased for the Facility.

Design/Build Agreement at 75, § 11.4.6.

In addition to incorporating the terms of the Design/Build Agreement into the Subcontract,[4] Section 8.3 of the Subcontract[5] provides:

> **Release:** The Subcontractor hereby releases, and shall cause its subconsultants, subcontractors and suppliers of any level ("Releasing Parties") to release Design-Builder [Hunt Construction Group, Inc.], the Owner [the Arizona Cardinals and Tourism and Sports Authority], and their respective members, managers, officers, directors, consultants, employees and agents (the "Released Parties") from any and all claims or causes of action whatsoever which the Releasing Parties might otherwise possess resulting in or from or in any way connected with any loss covered and actually paid or which would have been covered by an insurance policy as agreed by the parties hereunder but for the Releasing Parties' failure to purchase, maintain, or properly file claims under such policy. This release is further intended to bind the Releasing Parties' insurers, and the Subcontractor agrees to inform and obtain permission from it insurers, and further agrees to require the other Releasing Parties to inform and obtain permission from their insurers, to so release the Released Parties from any and all claims or causes of action as provided

---

[3] The Contract provides, that "The Team, the Authority and the Design/Builder are collectively referred to as the 'Parties.'" Design/Build Agreement at 1.

[4] Section 2 of the Subcontract provides that the Subcontract and the Design/Build Agreement "are intended to supplement and complement each other and shall, where possible, be so interpreted." Subcontract at 2, ¶ 2.2. Further, the Design/Build Agreement was incorporated by reference into the Subcontract. The Subcontract states, "Subcontractor is bound thereby as if the text of these documents were written verbatim into this Subcontract." *Id.* at ¶ 2.3. The Subcontract also provides, "The terms and provisions of this Subcontract relating to Subcontractor's Work are in addition to and not in substitution of any terms and conditions of the Contract Documents." *Id.* at 5, ¶ 3.5(f).

[5] As noted above, the Parties to the Subcontract are Hunt Construction Group, Inc. and Defendant Crown Corr, Inc.

> above, so as to effectively waive any subrogation rights of said insurers. *The Released Parties hereby release the Releasing Parties, and their respective members, managers, officers, directors, consultants, subcontractors, employees and agents from any and all claims or causes of action whatsoever which any of the Released Parties might otherwise possess resulting in or from or in any way connected with any loss to the extent it is covered and actually paid by any insurance policy provided hereunder or any other insurance policy otherwise available to the Released Party or that should have been covered by any insurance policy any Released Party was required to maintain. If the policies of insurance referred to in this Section require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such insurance policies will cause them to be so endorsed.*

Subcontract at 16, § 8.3 (emphasis added).

In response to Defendant's argument that these provisions operate as waivers of Plaintiff's subrogation rights, Plaintiff argues that there are three reasons why the waiver and release provisions do not bar its claims: (1) Section 11.4.6 of the Design/Build Agreement is not applicable because the waiver of subrogation expired upon substantial completion of the project; (2) Section 8.3 of the Subcontract does not bind Travelers because Tourism and Sports Authority, its insured, was not a party to that contract; and (3) Tourism and Sports Authority lacked authority to waive Traveler's subrogation claims through the waiver in Section 11.4.6. The Court will now address each of Plaintiff's arguments.

### 1. Whether the Waivers Expired Upon Substantial Completion

Plaintiff argues that the subrogation waiver in Section 11.4.6 of the Design/Build Agreement does not bar its claims because the intent of the Parties was that the waiver would only apply "in two limited circumstances: (1) on property/consequential loss insurance policies on adjacent properties; and (2) under property/consequential loss insurance policies purchased for the Facility." (Doc. 30 at 6). Plaintiff argues that "in both circumstances, the waiver was only effective during the ongoing Project before substantial completion and only on portions of the structure turned over to the Owner and on which the Owner assumed the responsibility to insure." (*Id.*). Plaintiff supports its assertion that the waiver was only effective before substantial completion with the argument that "the term 'Facility' in Section 11.4.6 refers to the structure during the ongoing Project and not to the completed stadium after substantial completion." (*Id.*). Plaintiff argues that its interpretation of the word

1  "Facility" is supported by other sections of the Contract that refer to the completed stadium
2  as the "fully equipped and operational Facility," and "complete and fully functional Facility."

### i. The Affidavit of Gerald W. Murphy

Plaintiff has offered the Affidavit of Gerald W. Murphy,[6] attached as Exhibit A to the Complaint, to establish the intent of the Parties when entering into the Design/Build Agreement. Defendant moves to the strike the affidavit as an improper attachment to a complaint. Accordingly, to evaluate Plaintiff's arguments regarding the intent of the Parties when entering into the Design/Build Agreement, the Court must first determine whether the Affidavit should be stricken.

Defendant argues that the Court should strike the Affidavit, as it is not a proper exhibit to a pleading, or if the Court finds that it is a proper exhibit, should not consider the Affidavit, as it is improper parol evidence. The Court agrees that this affidavit is not a proper exhibit to the Complaint, as it is evidentiary in nature and thus not a "written instrument" within Federal Rules of Civil Procedure 10(c). Accordingly, the Court will grant Defendant's Motion to Strike the Affidavit.

However, granting Defendant's Motion to Strike has no effect on the Court's analysis of the allegations contained in the affidavit. The affiant purports to explain the intent of the Parties when they entered into the Design/Build Agreement. At this stage, these kinds of allegations are properly pled in Plaintiff's Complaint, not in an evidentiary document attached to the Complaint. Plaintiff has properly included all of the allegations of the Parties' intent, which were contained in the affidavit, in the Complaint itself. Thus, the affidavit is merely duplicative of those allegations and granting Defendant's Motion to Strike has no effect on the Court's analysis of the allegations of the Parties' intent.

### ii. Legal Standard

Although the Court must accept the allegations in Plaintiff's Complaint as true, the

---

[6] Mr. Murphy is President of Murphy Consulting, LLC and was hired by Tourism and Sports Authority "to provide consulting services relating to design, contract negotiations, and construction" of the Stadium.

question of whether the written language of a written agreement is "reasonably susceptible" to the meaning asserted is a matter of law, not of fact. *Long v. City of Glendale*, 93 P.3d 519, 528 (Ariz. Ct. App. 2004) (internal citation omitted). Arizona law provides that, before accepting as true allegations of the intent of the Parties to interpret a written agreement, the Court must first consider the interpretation offered through such allegations. *Id.* Next, the Court should consider the language of the writing. *Id.* If the Court finds that the writing is 'reasonably susceptible' to the interpretation suggested by those allegations, the Court may consider whether that interpretation could entitle the Plaintiff to relief in deciding a motion to dismiss. *Id.* (internal citation omitted).

However, if the Court determines that the written language is not reasonably susceptible to the meaning asserted, dismissal of any claims depending solely upon such an interpretation is appropriate because the proponent "would not be entitled to relief under any interpretation of the facts susceptible of proof." *Id.* (internal quotation omitted).

### iii.    Analysis

The Court finds that, as used in the Contract, the term "Facility" is not reasonably susceptible to Plaintiff's interpretation. Recital A of the Design/Build Agreement[7] defines Facility as "a multipurpose stadium Facility," "the primary purpose of which will be to accommodate professional football franchises, major college football bowl sponsors, other sporting events, and entertainment, cultural, civic, meeting, trade show or convention events or activities." (*Id.* at 1). In contrast, the Design/Build Agreement defines "Work" as "all design and construction services necessary for the timely and proper design, construction and furnishing of the fully equipped and operational Facility in accordance with this Agreement . . ." Design/Build Agreement at 11, § 1.5. Similarly, "Project" is defined as "the design, construction, and furnishing of the fully equipped and operational Facility."

In addition to the plain meaning conveyed by these definitions, a careful reading of

---

[7] The "Definitions" Section of the Design/Build Agreement provides, "'Facility' has the meaning set forth in Recital A." Design/Build Agreement at 10, § 1.5.

- 9 -

the entire Contract convinces the Court that when the Parties refer to the Stadium before completion, they use either "Work" or "Project" and when they refer to the Stadium after it is fully operational, they use the term "Facility." Accordingly, the Court finds that the meaning of the term "Facility" is clear on the face of the Design/Build Agreement and is not reasonably susceptible to Plaintiff's interpretation.

Without reading Plaintiff's interpretation of "Facility" into the Contract, there is no support for Plaintiff's argument that the Parties to the Design/Build Agreement intended to limit the subrogation waiver to insurance carried only before substantial completion of the Stadium. Section 11.4.6 states that Tourism and Sports Authority waives subrogation against subcontractors on *all* property policies purchased for the Facility.

Moreover, other sections of Article 11 support the Court's conclusion that if the Parties intended to limit the waivers only to insurance carried before substantial completion, they would have clearly stated that intention. For instance, when discussing the Design/Builder's obligation to carry property insurance, the Contract provides, "Insurance to apply to the construction term from Commencement of Construction to Substantial Completion or the first major public event at the Facility, whichever is first." (Design/Build Agreement at 73, § 11.4.1(m)). This indicates to the Court that the Parties were aware that some insurance policies would only be carried through substantial completion and yet the subrogation waiver states that it applies to all "property policies purchased for the Facility."

If the Court were to adopt Plaintiff's interpretation of the word "Facility," it would change the meaning of the word as defined and used throughout the Contract. Because Plaintiff's claim that it was the Parties intention only to waive subrogation for insurance policies prior to substantial completion is not supported by the plain language of the Design/Build Agreement, it is impermissible for the Court to add such limiting language to the Contract. *See Long*, 93 P. 3d at 529 ("one cannot claim that one is 'interpreting' a written clause with extrinsic evidence if the resulting 'interpretation' unavoidably changes the meaning of the writing"); *Velarde v. Pace Membership Warehouse, Inc.*, 105 F.3d 1313, 1317-18 (9th Cir. 1997) (applying Arizona law and holding that a court can look to parol

- 10 -

evidence to interpret the meaning of a contract, but is not permitted to add an implied condition precedent to the contract).

Accordingly, the Court finds that the waiver of subrogation in Section 11.4.6 applies to the Traveler's policy in this case.

### 2. Whether Travelers is Bound by Section 8.3 of the Subcontract

Plaintiff next argues that, because its insured was not a party to the Subcontract, it is not bound by the mutual release of subrogation contained in Section 8.3 of the Subcontract. The Court notes that, although not a party to the Subcontract, Tourism and Sports Authority had the authority to review and approve the Subcontract.[8]

However, the Court need not decide whether Tourism and Sports Authority would be bound by the waiver in the Subcontract because it has already determined that Tourism and Sports Authority waived its subrogation rights in the Design/Build Agreement. Although Defendant was not a party to the Design/Build Agreement, it was clearly an intended beneficiary of the subrogation waiver, which specifically waived subrogation claims against subcontractors. Otherwise, there would have been no reason to include subcontractors in the waiver provision. *See United States Fidelity and Guaranty Co. v. Farrar's Plumbing and Heating Co., Inc.*, 762 P.2d 641, 642 (Ariz. Ct. App. 1988) (holding that where waiver language in a contract between an owner and a contractor included subcontractors, subcontractor was clearly an intended beneficiary of those clauses because "they would make no sense otherwise."). Accordingly, the Court need not determine whether Plaintiff is bound by the waiver of subrogation in the Subcontract because it is bound by the waiver provision in the Design/Build Agreement.

### 3. Whether Tourism and Sports Authority could Waive Traveler's Subrogation Claims

---

[8] The Design/Build Agreement provides, "All . . . Subcontracts with any proposed Subcontractor exceeding $250,000 shall be submitted to the Owner for its review and approval." Design/Build Agreement at 39, § 4.1. The Subcontract is priced at $22,271,150.00. Subcontract at 1, ¶ 1.5.

- 11 -

Plaintiff next argues that its insured, Tourism and Sports Authority, could not unilaterally waive Plaintiff's right to subrogation. Plaintiff relies on the fact that Tourism and Sports Authority did not waive any of its own claims against the Parties to the Contracts, but merely waived its insurer's subrogation rights. Plaintiff argues that, for its rights to be waived, it would have had to be a party to the contract or consented to the contract. Plaintiff asserts that other jurisdictions have held that an unauthorized waiver of an insurer's subrogation rights does not bar the insurer from pursuing subrogation. The Court recognizes that there is a split among state courts on this issue[9] and Arizona has not expressly dealt with it.

Under Arizona law, there is no doubt that "if the insured releases its claims against the third party-even without the insurer's consent-the insurer will be barred from asserting that claim against the third party by way of subrogation."[10] *Monterey Homes Arizona, Inc. v. Federated Mut. Ins. Co.*, 212 P.3d 43, 47 (Ariz. Ct. App. 2009). Plaintiff argues that rule does not apply to this case because its insured retained its own right to assert claims and its own right to indemnification and only purported to waive its insurer's right to subrogation. Plaintiff argues that, without waiving its own rights, Tourism and Sports Authority could not waive its subrogation right without Plaintiff's consent.

At the outset, the Court notes that it is not entirely clear that Traveler's did not consent

---

[9] *See Universal Underwriters Ins. Co. v. A.Richard Kacin, Inc.*, 916 A.2d 686, 692-93 (Pa. Super. Ct. 2007) (discussing the split among state courts and comparing state appellate court decisions that "concluded it was inequitable to bind an insurer to an agreement it did not join" and state court decisions that "view the right of subrogation as dependent entirely on the viability of the insured's cause of action against the third-party tortfeasor, and thus hold that where any such cause of action has been waived, the insurer's ability to bring a subrogation claim is waived as well, regardless of notice or consent.").

[10] An important exception to this rule is that "an insurer will retain its rights to pursue subrogation from the third party if the third party knew of the insurer's subrogation interests *before* it obtained the release from the insured." *Monterey*, 212 P.3d at 47 (emphasis added). However, the exception does not apply to this case because the Contracts at issue were entered into before Traveler's issued its insurance policy to Tourism and Sports Authority.

- 12 -

to its insured waiving its subrogation rights. The Traveler's Policy in question contains the following section:

> Subrogation - All Other Coverages
> If any person or organization to or for whom the Company makes payment under this policy has rights to recover damages from another; those rights are transferred to the Company to the extent of such payment. That person or organization must do everything necessary to secure the Company's rights and must do nothing after the loss to impair them. The company will be entitled to priority of recovery against any such third party (including interest) to the extent the payment has been made by the Company, plus attorney's fees, expenses or costs incurred by the Company.
> *But, the Insured may waive its rights against another party by specific written agreement:*
> *a. Prior to the loss to Covered Property . . .*

(Travelers Policy at General Conditions, Page 9 of 9) (emphasis added).

Travelers argues that this section only stands for the proposition that its insured could waive its *own* rights to assert claims by specific written agreement, not that the insured could waive Traveler's subrogation rights. Due to the purpose of this section of the policy, the Court questions Plaintiff's interpretation of this provision. However, the Court does not depend on Traveler's consent to the waiver of its subrogation rights, through this policy language, in deciding the Motion to Dismiss.

As applied to the facts of this case, the Court finds that the waiver of subrogation may be enforced against Plaintiff, even if it did not consent to its insured signing such a waiver. Arizona courts have recognized the important public policy purposes that waivers of subrogation serve in cases involving construction contracts. *See Farrar's*, 762 P.2d at 642. The waivers of subrogation in the Design/Build Agreement and the Subcontract show that the Parties mutually agreed to share the burden of any Party's negligence through the purchase of insurance and all Parties agreed not to sue each other for damages covered by insurance.

"Construction contracts often contain provisions which require the parties to waive their right to claim damages against one another up to the amount of insurance coverage available for their losses." 4 Philip L. Bruner & Patrick J. O'Connor, Jr., BRUNER & O'CONNOR ON CONSTRUCTION LAW, *Subrogation*, §11:192 (2011). These waivers are

usually included in such contracts "to cut down the amount of litigation that might otherwise arise due to the existence of an insured loss." *Id.* Such subrogation waivers operate as risk-shifting provisions "premised upon the recognition that it is economically inefficient for parties to a contract to insure against the same risk." *John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1069 (Md. 2010) (internal citation omitted).

In this case, the insured entered into the waiver of subrogation *before* the insurance policy was obtained. Plaintiff either had notice of the subrogation waiver or could have had notice had it asked to see the contract applicable to the property it was insuring. Plaintiff obtained its subrogation rights through its insured. If it wanted to premise the giving of insurance upon the insured maintaining its subrogation rights, it certainly could have done so or refused to provide insurance because its insured had already entered into a contract waiving Plaintiff's subrogation rights. Because the only party to the Contracts in privity with Plaintiff was Tourism and Sports Authority, it would be impossible for other Parties to the Contracts, made before the acquisition of the insurance policy, to ensure that Tourism and Sports Authority told its insurer of the waiver.

Accordingly, insurers are in the best position to protect themselves against waivers of subrogation entered into by their insured before the acquisition of the insurance policy by "(1) inserting an exclusion into their policies that permits the insurers to deny coverage if any insured waive[d] the insurer's subrogation rights, (2) raising premiums to offset outlays incurred from the loss of their subrogation rights, (3) investigating whether a potential insured has already waived any subrogation rights, (4) requiring insureds to warrant at the time a policy is issued that their insureds have not, and will not, waive the insurers' subrogation rights, and (5) obtaining reinsurance to cover any waiver of subrogation rights." *Universal Underwriters*, 916 A.2d at 695 (quoting *Bakowski v. Mountain States Steel, Inc.*, 52 P.3d 1179, 1186 (Utah 2002)); *see* 16 Lee R. Russ in consultation with Thomas F. Segalla, COUCH ON INSURANCE, *Validity and Enforceability of Insured's Contractual Waiver*, § 224:79 (2011) (a waiver of subrogation is "one factor taken into consideration by underwriters when deciding to write the risk"). For the foregoing reasons, the Court finds

1 that Plaintiff is bound by its insured's waiver of its subrogation rights and, thus, the waiver
2 in the Design/Build Agreement bars Plaintiff from asserting breach of contract and breach
3 of contractual indemnity claims against Defendant.

### B. Negligence (Count Three of the Complaint)

Defendant argues that Plaintiff's negligence claim should be dismissed because the economic loss doctrine bars Plaintiff from recovering in tort. Under Arizona law, the economic loss doctrine prevents a plaintiff who contracts for construction from recovering in tort for purely economic loss, unless the contract otherwise provides. *Flagstaff Affordable Housing Ltd. P'ship v. Design Alliance, Inc.*, 223 P.3d 664, 670-71 (Ariz. 2010). "The doctrine does not bar tort recovery when the economic loss is accompanied by physical injury to persons or other property." *Id.*

Plaintiff argues that the economic loss doctrine does not apply to negligence claims by a plaintiff who has no contractual relationship with defendant and that, because its insured was not a party to the Subcontract, there is no contractual relationship between it and Defendant. Plaintiff next argues the economic loss doctrine does not apply to damage to "other property" and because the metal panels that detached from the Stadium damaged "not only the Stadium, including its roofing systems, but also [Tourism and Sports Authority's] business personal property (sound system speaker clusters)," "other property" was damaged in this case. (Doc. 30 at 15).

#### 1. Legal Standard

In *Flagstaff*, the Arizona Supreme Court recognized that the "economic loss doctrine may vary in its application depending on context-specific policy considerations." 223 P.3d at 669. It explained that, because a context-specific analysis is necessary, the different policies served by tort and contract law should serve as the bases for determining when a party should be entitled to seek tort remedies and when the party should be limited to contract remedies. *Id.* In deciding to extend the economic loss rule to construction defect cases, it noted that:

> [t]he contract law policy of upholding the expectations of the parties has as

> much, if not greater, force in construction defect cases as in product defect cases. Construction-related contracts often are negotiated between the parties on a project-specific basis and have detailed provisions allocating risks of loss and specifying remedies. In this context, allowing tort claims poses a greater danger of undermining the policy concerns of contract law. That law seeks to encourage parties to order their prospective relationships, including the allocation of risk of future losses and the identification of remedies, and to enforce any resulting agreement consistent with the parties' expectations.

*Id.* Upon consideration of these policies, the *Flagstaff* court concluded that "in construction defect cases, 'the polices of the law generally will be best served by leaving the parties to their commercial remedies' when a contracting party has incurred only 'economic loss, in the form of repair costs, diminished value, or lost profits.'" The doctrine thus "respects the expectations of the parties when, as will often be true, they have expressly addressed liability and remedies in their contract . . . and if the parties do not provide otherwise in their contract, they will be limited to contractual remedies for any loss of the bargain resulting from construction defects that do not cause personal injury or damage to other property."

### 2. The Relationship Between Tourism and Sports Authority and Defendant

With these considerations in mind, the Court turns to Plaintiff's argument that the economic loss doctrine does not apply to its claims because its insured had no direct contractual relationship with Defendant.

In this case, in both the Design/Build Agreement and the Subcontract, the Parties expressly addressed liability and remedies. In the Design/Build Agreement, the Parties agreed that insurance carried by any of them on the Stadium would cover property damage to the Stadium and they mutually agreed to waive subrogation claims, not only against each other, but also against design professionals and subcontractors. As noted above, Defendant, as a subcontractor, was clearly an intended third party beneficiary of that contract. Further, as noted above, the Design/Build Agreement provided that all agreements with subcontractors, like the Subcontract at issue here, "shall be submitted to" [Tourism and Sports Authority] for its review and approval." *See* Design/Build Agreement at 39, § 4.1.

Although the Arizona Supreme Court did not specifically address applying the economic loss doctrine to agreements between Parties not in direct privity, the policy

considerations laid out in *Flagstaff*, support a finding that the economic loss doctrine does apply in this case.

The Contracts were specifically negotiated with the Stadium project in mind and the Parties allocated risks and remedies in their agreements. The Parties did not agree to preserve tort remedies, but instead agreed to waive subrogation against all Parties, subcontractors, and design consultants. Tourism and Sports Authority had plenty of opportunities to assert its right to tort remedies, but instead chose to allow insurance to bear the burden of risk associated with the project. Because of the complex contractual relationships in construction defect cases, Courts have extended the economic loss doctrine to interrelated contracts where, as here, the Parties have had an opportunity to bargain for their rights. *See BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004) ("The policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship. Contractual duties arise just as surely from networks of interrelated contracts as from two-party agreements."); *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1235 (Wyo. 1996) (Although contractor had not contracted directly with engineer on a project, its negligence claims against engineer were barred by economic loss rule, where contractor had opportunity to allocate risks associated with costs of the work when it contracted with water supply joint powers board on the same project.). Accordingly, because all Parties contracted for the risks and remedies related to the project, the economic loss doctrine necessarily limits the Parties to their contractual remedies.

### 3. Whether there was Damage to "Other Property"

Plaintiff next argues that the economic loss doctrine does not apply here because Defendant's negligence led to the damage of "other property," and such claims are not precluded by the economic loss doctrine.

In Arizona, "economic loss" "refers to pecuniary or commercial damage, including *any decreased value or repair costs for a product or property that is itself the subject of a contract* between the plaintiff and defendant, and consequential damages such as lost

profits." *Flagstaff*, 223 P.3d at 667 (emphasis added). "When a construction defect causes only damage to the building itself or other economic loss, common law contract remedies provide an adequate remedy because they allow recovery of the costs of remedying the defects and other damages reasonably foreseeable to the parties upon entering the contract." *Id.* at 669 (internal citations omitted).

Plaintiff argues that the "property that is itself the subject of [the] contract" is limited to the portion of the property that the subcontractor was itself working on, and not the Stadium as a whole. The project-specific subject of both contracts is the "multipurpose stadium facility, the primary purpose of which will be to accommodate professional football franchises, major college football bowl sponsors, other sporting events, and entertainment, cultural, civic, meeting, trade show or convention events or activities." Both Contracts address remedies available for damage to the Stadium as a whole. The Parties intended to make insurance available for any damage to the Stadium and to mutually waive subrogation rights against each other. Accordingly, there is no "other property" that was damaged, as both Contracts treat the fully completed Stadium as the property that is itself the subject of the Contracts. *See Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 732 (Ind. 2010) (discussing at length what constitutes "other property" and holding that when the product or service is purchased as an integral part of the an entire construction project, the economic loss rule applies to bar a negligence claim for damage caused even to parts of the project not part of the individual product or service).

Further, although Plaintiff asserts that the sound system speaker clusters are its personal business property and thus constitute "other property," not part of the Stadium, the Court finds that Plaintiff has made no arguments to back up this conclusory assertion. Defendant points to the "TSA/Cardinals Multi-Purpose Facility Schematic Design Drawing Log" to show that Audio/Visual equipment and installation was contemplated in the contract as being part of the Stadium. *See* Design/Build Agreement, Exhibit A. Plaintiff has provided no argument that Tourism and Sport Authority, "a political subdivision of the State of Arizona empowered to construct, finance, furnish, maintain, improve, own, operate, market

1 and provide" the Stadium, owns, as personal property, speaker clusters designed for and built into the Stadium. Because Plaintiff has provided no other purpose for such speaker clusters and the Court can ascertain no purpose for such speaker clusters specifically designed for and built into a football stadium, Plaintiff has failed to demonstrate that these speaker clusters demonstrate "other property," not part of the Stadium, as property not covered by the Contracts. Accordingly, the Court finds that, as applied to the facts of this case and the policy considerations discussed above, Plaintiff's negligence claim is barred by the economic loss doctrine.

### IV. LEAVE TO AMEND

Although Plaintiff has not requested leave to amend, the Ninth Circuit has instructed district courts to grant leave to amend, *sua sponte*, when dismissing a case for failure to state a claim, "unless the court determines that the pleading could not possibly be cured by the allegations of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). In light of the Court's finding that the waivers in the Design/Build Agreement and the Subcontract bar Plaintiff's claims, the Court finds that Plaintiff's Complaint could not possibly be cured by allegations of other facts.[11] Accordingly, the Court will not grant Plaintiff leave to amend.

Based on the foregoing,

**IT IS ORDERED** denying Defendant's Motion for Summary Disposition of the Motion to Dismiss Third Amended Complaint with Supporting Affidavit (Doc. 27).

**IT IS FURTHER ORDERED** granting Plaintiff's Motion for Extension of Time to Answer (Doc. 28).

---

[11] Further, Plaintiff has already filed a Third Amended Complaint, without requesting leave of the Court. Plaintiff filed this Complaint with the benefit of the arguments made in Defendant's Motion to Dismiss First Amended Complaint (Doc. 15) and Defendant's Motion to Dismiss Second Amended Complaint (Doc. 18), wherein Defendant made substantially the same arguments that it made in its Motion to Dismiss the Third Amended Complaint (at issue here). Despite having the benefit of knowing Defendant's arguments in support of its Motion to Dismiss, Plaintiff has still failed to allege facts that would entitle it to relief.

**IT IS FURTHER ORDERED** granting Defendant's Motion to Strike Affidavit Attached to Third Amended Complaint (Doc. 23).

**IT IS FINALLY ORDERED** granting Defendant's Motion to Dismiss (Doc. 22) with Prejudice. The Clerk of the Court shall enter judgment for Defendant.

DATED this 27th day of December, 2011.

*/s/ James A. Teilborg*
James A. Teilborg
United States District Judge